**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 14-20098-01/02-CM |
| | ) | |
| **EDWARD MCLINN,** | ) | |
| and | ) | |
| **DARYL R. MCLINN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS FOR FAILURE TO**
**STATE AN OFFENSE PURSUANT TO FED.R.CRIM.P. 12(b)(3)(v)**
**and**
**MOTION TO DISMISS 18 U.S.C. 922(g)(4) IS BOTH**
**UNCONSTITIONALLY FACIALLY VAGUE AND VAGUE AS**
**APPLIED TO EDWARD MCLINN IN VIOLATION OF THE FIFTH**
<u>**AMENDMENT RIGHT TO DUE PROCESS**</u>

The United States of America, by and through Terra D. Morehead, Assistant

United States Attorney for said District, and hereby responds in opposition to the <u>Motion</u>

<u>to Dismiss 18 U.S.C. 922 is Both Unconstitutionally Facially Vague and Vague as Applied</u>

<u>to Edward McLinn in Violation of the Fifth Amendment Right to Due Process</u> (Doc. 52),

and <u>Motion to Dismiss for Failure to State an Offense Pursuant to Fed.R.Crim.P.</u>

<u>12(b)(3)(v)</u>(sp.) (Doc. 53), filed on February 17, 2016 by defendant Edward McLinn, and

<u>Motion to Join Co-Defendant's Motion to Dismiss</u> (Doc. 59), filed on April 1, 2016 by

defendant Daryl McLinn.   Edward McLinn's motions attempts to challenge the viability of

Count 1, first prior to consideration by a jury, under Rule F.R.Crim.P. 12(b)(3)(v), and

second on a challenge to the constitutionality of Title 18, U.S.C. § 922(g)(4) asserting that

it violates due process under the Fifth Amendment.   Because the defendant's two

1

motions involve the same count, and because much of the procedural and legal arguments intertwine, the Government had opted to respond to both motions in a single Response in Opposition. Edward McLinn was determined to be a mental defective, and he was also committed to a mental institution, thus the statutory provisions of Title 18, U.S.C. § 922(g)(4) apply to him, and this statute does not unconstitutionally apply to him. Daryl McLinn's attempt to join these two motions is improper, as Daryl McLinn is without standing because he is not charged in connection with Count 1.

### I. Factual and Procedural Background

Edward McLinn first came to the attention of Douglas County, Kansas officials on May 26, 2006, when he was found to be in possession of cocaine and marijuana during an encounter with law enforcement. (*See* Doc. 57-1.) On May 27, 2008, Edward McLinn entered a guilty plea to the felony charge of Possession of Cocaine, and a misdemeanor charge of Possession of Marijuana. (*Id.*) On August 12, 2008, he was sentenced to 11 months in prison on each of the counts, which were ordered to run concurrently, and he was granted 18 months of probation in lieu of imprisonment. (*Id.*) Edward McLinn was prohibited under Kansas state law, as a result of the felony drug conviction, from possessing a firearm for a period of 10 years from the date of his conviction. (*See* K.S.A. 21-6304(a)(3)(A).) McLinn took steps to attempt to get this conviction expunged on June 20, 2014, when he filed a petition in Douglas County District Court; however, the Court took no action on his request.

On May 24, 2013, Lawrence, Kansas police arrested Edward McLinn for operating a vehicle under the influence. McLinn entered a diversion program for the D.U.I. charge.

On August 27, 2013, Lawrence police were called to a BP gas station where they

encountered Edward McLinn wrapped only in a shower curtain with what appeared to be chemical burns on his person, bloodshot eyes and other minor injuries. Edward McLinn told officers he had used methamphetamine and other drugs approximately 3 1/2 years before, and that he was cleaning his residence with heavy cleaners. McLinn said he was in the shower and heard one of his dogs collapse, so he panicked and left the residence by climbing out a window, only wearing the shower curtain. McLinn claimed earlier in the day that police had been pumping "knock-out gas" into his residence through his air conditioning unit, and that police were drilling into his walls to pump gas through the house as well. McLinn indicated he didn't know why police were doing this. McLinn later admitted that he had used methamphetamine the night before, and were concerned the police were going to get a search warrant for his house, so he began to clean the residence with the industrial cleaner.

Due to McLinn's statements, injuries, and behavior, officers applied for and received a search warrant for McLinn's residence at 2527 Crestline Court, Lawrence, Kansas. McLinn was taken to an emergency room and the doctor was concerned his psychoses would endanger his wellbeing. McLinn refused to seek inpatient hospitalization because he did not think he had a mental health issue. McLinn was evaluated by Susan Hadl, a mental health evaluator, who filed a petition on August 27, 2013, for an involuntary commitment through Douglas County District Court. (See Doc. 53, D.Ex. 1[1].) Ms. Hadl also applied for a temporary custody/protective custody order, and requested appointed of counsel, and a mental health evaluation at Osawatomie State

_____

[1] The petition filed in Douglas County had an additional page that the defendant failed to include in his exhibit. This page is attached hereto as Attach. #1.

Hospital, all of which were granted by the court. (*See Id.* D.Exs. 2-4.) The court set the matter for a hearing on August 29, 2013. (*See Id.* D.Ex. 5.)

On August 29, 2013, the matter was heard before the Honorable Peggy Carr Kittel, who determined after hearing evidence and arguments that there was probable cause to believe that Edward McLinn was suffering from a severe mental disorder, lacking the capacity to make an informed decision concerning treatment, and was likely to cause harm to himself or others. As a result, Judge Kittel ordered McLinn to be involuntary committed to Osawatomie State Hospital (OSH), pending a trial on the matter, and venue was transferred to Miami County District Court. (*See Id.* D.Ex. 6; Attach. #2.)

On September 3, 2013, OSH determined that Edward McLinn was fit for discharge pursuant to K.S.A. 59-2974. (*See Id.* D.Ex. 7.) The defendant was specifically issued Discharge Instructions, which Edward McLinn signed on September 3, 2013. (Attach. #3.) Within those instructions, the defendant was specifically advised, as follows:

> It is a violation of the law for any person who has been involuntarily civilly committed to possess a firearm. For the restoration of the ability to legally possess a firearm, a petition must be filed in the District court where treatment was ordered. K.S.A. 75-7c26 provides a procedure for restoration.

(*Id.*, at 3.) The defendant did not demand a jury trial, and took the benefit of the discharge, allowing him to pursue outpatient treatment.

Beginning around December 13, 2013, Edward McLinn began purchasing firearm parts through on-line companies to manufacture a .223 caliber rifle. In order to complete the rifle, Edward McLinn knew that he would need a lower receiver and requested that his father assist with the purchase of the lower receiver. On December 27, 2013, Daryl McLinn made contact with Jayhawk Firearms and ordered a .223 caliber Stag Arms

4

forged lower receiver, serial number 304433, and requested that it be engraved to say "Second Amendment." Daryl McLinn filled out a Firearms Acquisition Form (Form 4473), indicating that he was the "actual buyer" of the firearm. On January 6, 2014, Daryl McLinn completed the firearm transaction with Jayhawk Firearms and acquired the firearm. Daryl McLinn acknowledged on the 4473 form that all of his answers were true, correct and complete.

On or about July 28, 2014, Daryl R. McLinn purchased and acquired a .45 caliber Sig Sauer pistol, Model P220, serial number 37B009039, from H & E Body and Gun Shop, 101 Baltimore, Seneca, Kansas. When Daryl McLinn filled out the Firearms Acquisition Form (4473), he indicated that he was the "actual buyer" of the firearm.[2]

On September 17, 2014, Lawrence City Manager David Corliss contacted Lawrence police because a number of Lawrence City Commissioners had received a series of emails from an individual at "edmclinn@gmail.com," which concerned Mr. Corliss and the commissioners because of the bizarre content of the emails, as well as a reference to having a firearm. In an email sent on September 16, 2014, at approximately 1:08 p.m., McLinn related that he was traveling in his vehicle with a "lawful firearm" in his vehicle, and claimed the Lawrence police were aware of the weapon with the "use of see-thru-walls surveillance information," and that they had sent undercover officers to investigate him. McLinn said he recognized the officers from years of experience, and that a marked patrol unit had been sent to the area to pull him over, but he did not do anything to warrant them to stop him. McLinn's email also reported that he was

_____

[2]Daryl McLinn's purchase of these two firearms was unknown until the execution of the search warrant at Edward McLinn's residence on September 18, 2014, more fully discussed below.

concerned the police had a strategy to generate and manufacture a crime.

In another email from McLinn, dated September 16, 2014, at approximately 3:40 p.m., McLinn again referenced that law enforcement were using illegal see-thru-wall technology. On September 17, 2014, at approximately 9:02 a.m., McLinn forwarded an email to the leadership from Doug Bonney of the ACLU Foundation of Kansas which McLinn had received at 8:53 a.m., requesting McLinn to remove the ACLU from future e-mails, stating the ACLU could not help him with the "problems you perceive."

As a result of the emails, Lawrence Detective Warren Burket was assigned to investigate the matter. On September 17, 2014, Detective Burket was able to locate at Instagram.com account for "Edward McLinn, Software Engineer, Lawrence, Ks." Detective Burket went to the site and reviewed an image of a white male standing in a bathroom wearing a tactical vest with a slung AR15-style rifle, which had a mounted light, green grips, and black/green stock. The male was taking a picture in a manner known as a "selfie," using a white cellular phone with the back removed and the battery exposed. In the image, the individual's face was obscured; however, the poster's face was to the right of the image, which showed a face shot. Next to the face shot was "edmclinn." Under the username was the information: "1 week ago" and the title "My Tactical Selfie." Other images on the Instagram account showed a subject in the same bathroom with the male's full face and body with the same user name.

Detective Burket researched Edward McLinn and learned about his criminal history background. He was able to review a mugshot from the Douglas County Jail and determined the person in the Instagram photos was the same individual, who had been processed for a D.U.I. in Lawrence, as well as the individual officers had taken photos of

involving McLinn in the shower curtain at the gas station.

On September 18, 2014, Detective Burket applied for and was granted a search warrant for McLinn's residence at 2527 Crestline Court, along with his vehicle, and any electronic devices from District Judge Kittel. On that same date Detective Burket and other officers executed the search warrant and arrested McLinn. As a result of the search officers located and seized a .45 caliber Sig Sauer pistol, Model P220, serial number 37B009039; a fully constructed .223 caliber Stag Arms rifle, serial number 304433; ammunition; a camouflage tactical vest with plates; a cellular telephone; computer hard drives; computer storage devices; and, miscellaneous documents for McLinn. The documents included paperwork for the purchase of the rifle, weapon part purchases, and insurance documentation for McLinn for service at Lawrence Memorial Hospital and OSH.

As a result of the seizure of the two firearms, a trace of the firearm history was requested by Detective Burket. He was able to determine that Daryl McLinn had purchased both firearms from separate Federal Firearms Licensees – Jayhawk Firearms and H & E Body and Gun Shop. Detective Burket then went to both FFLs, spoke to the individuals who sold Daryl McLinn the firearms, and gathered additional documentation regarding the transactions.

Edward McLinn's computer was searched by a forensic analyst. There were a number of documents that McLinn had drafted to various agencies, including the FBI, OSH, and the Lawrence Police Department, involving many of the events discussed above. In addition, there was an "Affidavit of Edward E. McLinn," along with a partially filled out Petition form, in which McLinn was working on having his firearm rights restored.

(Attach. #4.)  McLinn's computer revealed that the Petition was created on February 28, 2014, and modified on March 1, 2014, and that the Affidavit was created on March 6, 2014, and modified on June 11, 2014.  There were also a number of documents located specifically related to firearms.  There was documentation located from a company called "ComSec," where McLinn paid $4,890.00 to have his residence and vehicles searched for surreptitious surveillance equipment on October 11, 2011.  There were other documents demonstrating that Edward McLinn had possessed bizarre, twisted thinking, and has obsessed with conspiracy theories by Government and police officials, over an extended period of time.

On October 8, 2014, an Indictment was returned charging Edward McLinn in a single count, as follows:

> On or about September 18, 2014, in the District of Kansas, the defendant,
>
> ### EDWARD E. MCLINN,
>
> having been adjudicated a mental defective and committed to a mental institution; knowingly and unlawfully shipped and transported in interstate and foreign commerce, possessed in and affecting interstate and foreign commerce, and received firearms, namely, a .45 caliber Sig Sauer pistol, Model P220, serial number 37B009039, and a .223 caliber Stag Arms rifle, serial number 304433, and ammunition, which had been shipped and transported in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 922(g)(4) and 924(a)(2).

A subsequent Superseding Indictment was returned on September 2, 2015, adding a number of additional counts against Edward McLinn, and including Daryl McLinn as a defendant.  (Doc. 36.)  Count 1 remained the same in the Superseding Indictment, and is the charge that the defendant is challenging.  (*Id.*)

Most recently while on pretrial release, there are indications that McLinn continues

to have paranoid delusions, and has expressed delusional conspiracy theories about the government, i.e., he believes the government created mental illness, indicated the government is watching everyone, feels that when people in the news go shoot things up that they are being pushed by the government to do these drastic things.

## II. Discussion

### A. Motion to Dismiss 18 U.S.C. 922 is Both Unconstitutionally Facially Vague and Vague as Applied to Edward McLinn in Violation of the Fifth Amendment Right to Due Process.

#### 1. Section 922(g)(4) is not facially vague.

Edward McLinn is charged with belonging to both prohibited groups identified in § 922(g)(4), that is: 1) having been adjudicated a mental defective; and, 2) having been previously committed to a mental institution. There are two separate prongs under which a § 922(g)(4) charge can proceed. The Government will be able to establish beyond a reasonable doubt both prongs. The defendant asserts that the statute violates his Fifth Amendment because it violates his due process rights because it is facially vague.

The defendant attempts to rely upon *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015); however, his reliance is misguided. Johnson specifically dealt with the vagueness of the residual clause of the Armed Career Criminal Act (ACCA), which only those cases that had a qualifying prior offense that relied upon application under that clause. Also, because the Career Criminal provisions of the Guidelines (U.S.S.G. § 4B1.1) relied upon the same language, it also falls under the auspices of *Johnson*, because it would arguably be void for vagueness. *Johnson* has become a hot-button-citation for many challenges; however, this Court should find that it has no application herein. *Johnson* was specific to the residual clause language and is relevant

solely for application under the ACCA and Career Criminal provisions, and should not be used as a scapegoat for challenging other statutes.

The defendant attempts to attack the portion of the statute – mental defective – because it is not politically correct language. The defendant offers no authority to support that this would invalidate the statutory construction. The defendant suggests § 922(g)(4) has some level of "uncertainty about what tools should be used to interpret it" and "uncertainly about the degree of formality and finality . . . when it comes to adjudications and commitments." Saying this does not make it so. Section 922(g)(4) does provide specific direction about when it is to be applied – after someone has been adjudicated a mental defective or after an involuntary commitment to a mental institution. In fact, the defendant has failed to cite to a single case since the inception of § 922(g)(4) that have determined it to be unconstitutionally vague. Daryl McLinn also attempts to challenge the propriety of this charge; however, he is not charged with this offense, and has no standing to make any claims herein.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court declared the prohibition on the possession of firearms by the mentally ill to be presumptively lawful. It was explained that the longstanding prohibitions of firearm possession by prohibited individuals, like felons and the mentally ill, are exceptions to the Second Amendment. 554 U.S. at 626-27. 27 C.F.R. § 478.11 requires that to be prohibited from possessing a firearm, a person must be "[c]ommitted to a mental institution" through a "formal commitment . . . by a court, board, commission, or other lawful authority" and the commitment must be involuntary, and as will be discussed further below, the provisions under Kansas law and specifically as applied to Edward McLinn clearly satisfies this

requirement.

Possession of firearms by the mentally ill is one of a set of categorical "exceptions" to the Second Amendment that are comparable to some First Amendment exceptions. *Heller*, 554 U.S. at 635. These types of prohibitions are "meant to keep firearms out of the hands of presumptively 'risky people' . . . " *See United States v. Barton*, 633 F.3d 168, 173 (3d Cir. 2011)(*quoting United States v. Bass*, 404 U.S. 336, 345 (1971)).

It is important to note that the substance of Count 1 fairly tracks the statutory language of Title 18, U.S.C. § 922(g)(4), which prohibits any person "who has been adjudicated as a mental defective or who has been committed to a mental institution" from possessing firearms in or affecting commerce. These terms are not defined in the statute; however, the definition, contrary to the defendant's assertion, is clearly in the implementing regulations at 27 C.F.R. § 478.11.

While the defendant's argument claims a lack of statutory definitions of certain terms, the defendant recognizes that 27 C.F.R. § 478.11 defines the commitment prong to include:   1) a formal commitment of a person to a mental institution by a court (as in Kansas), board, commission, or other lawful authority; 2) commitment to a mental institution involuntarily (as was done with McLinn by Judge Kittel); 3) commitment for mental defectiveness or mental illness (as was done with McLinn when Judge Kittel found probable cause to believe McLinn was suffering from a severe mental disorder, lacked the capacity to make an informed decision concerning treatment and was likely to harm himself or others); or 4) commitments for any other reasons, such as for drug use[3].   In

---

[3] When McLinn was discharged he was given a diagnosis of Amphetamine-Induced Psychotic Disorder with delusions, Cannabis Abuse, and Alcohol

11

addition, the defendant also concedes that 27 C.F.R. § 478.11 defines the commitment prong to not include: 1) a person in a mental institution for observation; and 2) a voluntary admission to a mental institution.

The Gun Control Act does not specifically define the term "commitment" under § 922(g)(4). While determination of the issue of whether an individual "was committed to a mental institution is a question of federal law," a reviewing court may "seek guidance from state law." *United States v. Waters*, 23 F.3d 29, 31 (*quoting United States v. Giardina*, 861 F.2d at 1335; *see also United States v. Hansel*, 474 F.2d 1120, 1122–23 (8th Cir.1973) (the court considered the mental health law of Nebraska in determining "commitment"); *United States v. Chamberlain*, 159 F.3d 656, 658 (1st Cir. 1998) (same); *United States v. Whiton*, 48 F.3d 356, 358 (8th Cir. 1995) (same). However, in looking at guidance from state law, the court should look to the "substance of the state procedure, and not be bound by the terminology of the state statute. *United States v. Midgett*, 198 F.3d 143, 146 (4th Cir. 1999). It should be noted that in both *Giardina*, which involved the law of Lousiana, and *Hansel*, which involved the law of Nebraska, their state provisions were similar to Kansas provisions for a judicial determination; however, in neither of those cases did the formal commitment proceedings ever occur.

The *Waters* court found that the New York law, which did not require a formal proceeding still complied with federal law for the purposes of a "commitment."

The court in Waters noted:

> We believe that the New York State system of involuntary admission under § 9.27, with its attendant requirements of notice and judicial

Abuse, thus certainly evidence after the fact would support McLinn's commitment under this provision.

proceedings, comports with federal policy. Under § 9.27(a), a person must be "in need of involuntary care and treatment" in order to be admitted. Such treatment is necessary when it is "essential to such person's welfare and whose judgment is so impaired that he [or she] is unable to understand the need for such care and treatment." N.Y.Mental Hyg.Law § 9.01. Thus, as we found in Project Release, § 9.27 permits only the involuntary confinement of dangerous individuals who cannot survive in the community. 722 F.2d at 973–74. The federal gun control statute was designed to prevent ownership of firearms by just such persons. *See Huddleston*, 415 U.S. at 824, 94 S.Ct. at 1268; *Dickerson*, 460 U.S. at 112, 103 S.Ct. at 991. Here, Waters possessed a cache of firearms and a large quantity of ammunition and reported unsubstantiated strange "plots" to the ATF agents. Based upon the preceding analysis, we believe that it is wholly reasonable to conclude that, given the history of appellant and the fact that he gave evidence of having delusions, such a person, in possession of firearms, poses a grave and serious risk to the public at large. We believe this risk places appellant within the embrace of the prohibition Congress intended. The fact that he is no longer committed does not change this conclusion. "Congress made no exception for subsequent curative events. The past adjudication or commitment disqualifies . . . [because] such a person . . . [is] too much of a risk to be allowed firearms privileges." *Dickerson*, 460 U.S. at 116, 103 S.Ct. at 993 (citation omitted). Several federal courts have held that the statutory restrictions of the federal Gun Control Act regarding possession of firearms apply to persons who have been committed to mental health facilities and are later released or found to be competent. *See, e.g., Redford v. United States Dep't of Treasury, Bureau of Alcohol, Tobacco and Firearms*, 691 F.2d 471, 473 (10th Cir. 1982) (the prohibition of the federal gun control statute against those adjudicated mentally incompetent "provides no exceptions for people who have regained their competency or sanity or who have been released from confinement"); *United States v. Buffaloe*, 449 F.2d 779, 780 (4th Cir.1971) (per curiam) ("We also conclude that the [federal gun control] statute is not unconstitutional as to [appellant] because 16 months later he was discharged from the hospital."); *United States v. Jones*, 569 F.Supp. 395, 398–99 (D.S.C.1983) (finding that the statute did not unjustly punish persons who had been, at one point, adjudicated mentally ill).

The Tenth Circuit in *Redford*, specifically addressed whether the predecessor to § 922(g)(4) – 18 U.S.C. App. § 1202(a)(3) prohibiting someone who was adjudicated to be mentally incompetent – was unconstitutionally vague. Redford complained the statute did not define "mentally incompetent." The court noted:

That Congress might have more precisely defined a term does not render a statute unconstitutionally vague, *United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975), as long as it is not so uncertain that people of "common intelligence must necessarily guess at its meaning and differ as to its application," *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). In the instant case, we must determine whether people in Redford's position would reasonably understand that the statute applied to them.

Although section 1202(a)(3) does not define what constitutes being "adjudged by a court of the United States or of a state or any political subdivision thereof of being mentally incompetent," we believe people of common intelligence would understand that language to include persons found not guilty of a criminal charge by reason of insanity. Congress clearly intended to keep guns out of the hands of those who have demonstrated that " 'they may not be trusted to possess a firearm without becoming a threat to society.' " *Scarborough v. United States*, 431 U.S. 563, 572, 97 S.Ct. 1963, 1968, 52 L.Ed.2d 582 (1977) (quoting Sen. Russell Long, sponsor of section 1202). Given Congress's intent, we conclude that as applied to Redford, section 1202(a)(3) is not unconstitutionally vague.

Simply put, an involuntary commitment serves as a required proxy for the firearm prohibition for one with a mental illness, which is sometimes difficult to diagnose and identify. 27 C.F.R. § 478.11 has a predicate of a judicial determination of mental incapacity made with all the protections of due process, and the courts have determined the statutory and regulatory provisions in place are the best constitutional means of prohibiting mentally unstable persons from possessing firearms. *See Heller, supra*.; *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012) (observing "a free floating prohibition" on firearms possession by the mentally ill, which is why Congress required determinations to be made in "prior judicial proceedings to establish status.")

The defendant attempts to garner some strength in his argument that there has been inconsistency amongst courts in the application of § 922(g)(4), and specifically references the First Circuit by commenting that "[o]ne of the starkest examples of the

confusion these inconsistent interpretations engender comes from the First Circuit."
(See Doc. 52, 11-14.)   First, it should be noted that *Rehlander* reversed its prior holdings
in *Chamberlain* and *Holt*, not because of confusion, but because the Supreme Court
issued its decision in *Heller*, which implicated due process considerations.   *Rehlander*,
*Chamberlain,* and *Holt* are all factually distinguishable from McLinn's situation because
those cases involved a provision under Maine's involuntary psychiatric hospitalization
allowing for an emergency/temporary *ex parte* hospitalization without an adversarial
proceeding or a judicial determination that the person was mentally ill and a danger to
himself or others.   666 F.3d 45, 50.   While there was an initial (48 hour)
emergency/temporary *ex parte* hospitalization of McLinn under K.S.A. 59-2959, there
was a subsequent adversarial proceeding with a judicial determination by Judge Kittel.

Another case which has some unresolved legal history is *Tyler v. Hillsdale County
Sheriff's Department*, 775 F.3d 308 (6th Cir. 2014) (rehearing en banc granted, panel
decision vacated on April 21, 2015), is likewise factually distinguishable from that of
McLinn.   *Tyler* involved a 28 year old involuntary commitment; however, Michigan law
did not have a provision for restoration of rights.   Kansas law as applied to McLinn, as
further discussed below does have a restoration of rights provision.

The defendant also attempts to add fodder to his claim based upon the lack of
"available, meaningful, consistent jury instructions."   There are dozens of criminal
statutes that do not appear in the Tenth Circuit Criminal Pattern Jury Instructions, but that
certainly doesn't support a conclusion that those dozens of Federal statutes are vague.
The Government assumes that the Court will allow the parties to offer proposed
instructions, and that the Court and counsel will engage in a charging conference prior to

the Court instructing the jury on the state of the law herein.

### 2. Section 922(g)(4) is not vague as applied to the defendant.

The defendant suggests that Kansas law did not put McLinn on Notice of being subject to his deprivation of his right to possess firearms, which therefore makes § 922(g)(4) void for vagueness as to him. This assertion is not supported by any authority.

Regardless, the defendant's assertion is misplaced for two reasons. First, Kansas law does provide a notice provision under K.S.A. 75-7c27, which was enacted to comply with the NICS Improvements Amendments Act of 2007 (NIAA), Pub. L. 110-180, which was signed into law by the President on January 8, 2008. Second, the evidence bears out that McLinn was given notice and knew that he was prohibited federally from possessing a firearm.

When McLinn was discharged from OSH he fully acknowledged by signing that anyone who had been involuntarily committed (like him) was prohibited from possessing a firearm. (*See* Attach. #3.) As a part of McLinn's discharge paperwork, he was advised as follows: "It is a violation of the law for any person who has been involuntarily civilly committed to possess a firearm. For the restoration of the ability to legally possess a firearm, a petition must be filed in the District court where treatment was ordered. K.S.A. 75-7c26 provides a procedure for restoration." (*Id.*) Further, evidence from McLinn's computer revealed that he was preparing documents to submit to Douglas County District Court attempting to get his rights restored between February 28, 2014, and June 11, 2014. (*See* Attach. #4.) There is clearly evidence that McLinn received "notice" that he was prohibited from having a gun and that if he wanted to have those rights restored, he had to follow the proper restoration procedures. Still, to this day,

McLinn has never petitioned the Douglas County District Court as required under Kansas law.

### a. Kansas law pertaining to involuntary commitment proceedings.

A mentally ill person is defined as any person who is suffering from a mental disorder which is manifested by a clinically significant behavioral or psychological syndrome or pattern and associated with either a panful symptom or an impairment in one or more important areas of functioning, and involving substantial behavioral, psychological or biological dysfunction, to the extent that the person in in need of treatment. (K.S.A. 59-2946(e).)   There are further specific definitions for involuntary commitments under Kansas law that are similar to those provisions under Federal law. (See K.S.A. 59-2946(f)(1)-(3) and 27 C.F.R. § 478.11.)   Again, § 922(g)(4) is a **federal** law, which is governed by federal provisions.   It is only the substance of the state procedures that courts should look to, not terminology of state statutes.   *Midgett*, 198 F.3d at 146.

Under the provisions of K.S.A. 59-2945 et.seq., a petition for determination of mental illness is initiated by a petitioner (in McLinn's case by Susan Hadl, a mental health professional), alleging the person is a "mentally ill person," along with a request for an order for emergency observation and treatment.   (*See* K.S.A. 59-2957; Doc. 53, D.Ex. #1.)   Once the petition is filed, the court holds a formal adversarial hearing, in which the rules governing evidentiary and procedural matters are applied, in which the person is represented by an attorney, in which the court is presented with all relevant and material evidence, including information from a duly qualified expert and what they base their opinion on, and following which the court determines whether there is a probable cause

basis upon which to involuntary commit an individual. (*See* K.S.A. 59-2959.) Upon an appropriate finding, the court is able to make preliminary orders, including that the person be transported and involuntarily committed to a state hospital for a mental evaluation and care and treatment, as may be deemed appropriate. (*See* K.S.A. 59-2960, 59-2961, 59-2965.) The court also sets a time and place for a trial on the petition, no earlier than seven days and no later than 14 days from the filing of the petition. (*Id.*) This overall procedure is the precise procedure that was followed when Edward McLinn was involuntarily committed to OSH. (*See* Doc. 53, D.Exs. 2-6.) As was previously noted, on August 29, 2016, venue was transferred to Miami County District Court.

In the event the patient is deemed no longer in need of treatment prior to the trial, the facility is required to discharge and release the patient. (*See* K.S.A. 59-2973.) This was done when McLinn was discharged on September 3, 2011. (*See* Doc. 53, D.Ex. #7.) The matter can also proceed to trial and upon a finding that the person is mentally ill, the court can order further treatment. (*See* K.S.A. 59-2965, K.S.A. 59-2966.) Whenever a person who is involuntarily committed to a state psychiatric hospital is released by order of the court or termination of the case, the case can be reviewed upon request of the patient, and the court may order the issuance of the certificate of restoration pursuant to K.S.A. 2014 Supp. 75-7c26.

K.S.A. 59-2974 provides as follows:

> Notice of discharge; restoration of certain rights. The head of the treatment facility shall notify, in writing, the patient, the patient's attorney, the petitioner or the petitioner's attorney, the county or district attorney as appropriate, and the district court which has jurisdiction over the patient of the patient's discharge pursuant to K.S.A. 59-2973, and amendments thereto. When a notice of discharge is received, the court shall file the same which shall terminate the proceedings, unless there has been issued

a superseding inpatient or outpatient treatment order not being discharged by the notice. Whenever a person who is involuntarily committed to a state psychiatric hospital is released by order of the court or termination of the case, the court shall review the case upon request of the patient, and may order the issuance of the certificate of restoration pursuant to K.S.A. 2012 Supp. 75-7c26, and amendments thereto. If the court issues such release or termination and certificate, the court shall order the clerk of the district court to report the release or termination of the case and the certificate of restoration to the Kansas bureau of investigation within five days after the order.

McLinn never pursued this procedure, which had it been determined he was not mentally ill, his restoration of his rights would have been immediately restored. Instead, McLinn acquiesced to his discharge with directions by OSH.

### a. The history behind K.S.A. 75-7c27.

The NIAA was enacted following the April 2007 shooting at Virginia Tech by an individual with a mental health history. The shooter's mental health history was not made known at the time of his purchase of firearms during a routine check through NICS (National Instant Criminal Background Check System). The NIAA was a bipartisan effort to strengthen the NICS by increasing the quantity and quality of relevant records accessible to the system. The NIAA sought to address the gap in information available to NICS about such prohibiting mental health adjudications and commitments and other prohibiting backgrounds. It was believed that tilling these informational gaps would better enable the system to operate as intended – to keep guns out of the hands of persons prohibited by federal or state law from receiving or possessing firearms.

Prior to the NIAA, § 922(g)(4) was effectively a lifetime prohibition on possessing firearms by any person "who had been adjudicated a mental defective or who has been committed to a mental institution." Concerns were expressed to Congress about the

permanence of this prohibitor and the life-long effect it would have on persons whose mental health adjudication or commitment records would be provided to the NICS under the Act's provisions.   To address these concerns, the Act included not only provisions to require or promote the sharing of the existence of information about this disability for use by the NICS, but also provisions that require or authorize the establishment of federal and state programs that allow individuals to seek relief from the federal mental health firearms disability if circumstances warrant, i.e., relief from disabilities.

The NIAA efforts caused state laws to be reviewed and the Act provided for a number of incentives for states to meet the goals it set for greater record completeness, which primarily involved access to federal grant funding.   The Act provided that when relief was granted under a federal or state relief from disabilities program that meets the requirements of the Act, or when certain automatic relief conditions were met with respect to persons federally adjudicated or committed, the event giving rise to the mental health disability was "deemed not to have occurred" for purposes of the federal firearm prohibition.   The Act, however, does not and did not provide relief to an individual, i.e., affirmative defense, simply if a state fails to provide documentation as required by their state's laws.

The review under NIAA was done of the Kansas laws in effect in 2009, which resulted in a determination that Kansas law was lacking.   As a result, Kansas faced the loss of considerable grant funding that caused them to amend and add to their existing provisions.   During the legislative session of 2011, the Senate Judiciary was presented with HB2329, in order to come into compliance with NIAA, because it had been determined that Kansas law did not provide for adequate relief from the disabilities

imposed by 18 U.S.C. § 922(g)(4). This included testimony from David Hutchings, Special Agent in Charge of the Kansas Bureau of Investigations. (See Attach. #5.)

As a result of the proposal, there was amendment to K.S.A. 75-7c26, but most importantly it resulted in the implementation of K.S.A. 75-7c27. As a result of this specific statute being enacted Kansas was found to be compliant with NIAA in 2011.

The defendant specifically has complained that he was not afforded due process; however, K.S.A. 75-7c27 specifically provided for full due process in the involuntary commitment arena, allowing for a defendant who was subject to an involuntary commitment to have their rights restored. The Kansas statute goes so far as to outline that "due process" requires that: (A) The petitioner shall have the opportunity to submit their own evidence; (B) an independent decision maker, other than the individual who gathered the evidence for the court acting on the application; and (C) a record of the proceedings. Clearly, based upon the evidence on McLinn's computer he was contemplating having his rights restored; however, he never pursued his full right to due process to effect that goal.

### B. Motion to Dismiss for Failure to State an Offense Pursuant to Fed.R.Crim.P. 12(b)(3)(v)(sp.)[4].

The defendant is in essence seeking a pre-trial determination of his guilt by this Court. An Indictment is normally sufficient unless no reasonable construction can be said to charge the stated offense. *United States v. Nabors*, 45 F.3d 238 (8th Cir. 1995). Here, Count 1 of the Superseding Indictment sufficiently charges Edward McLinn under the plain language of the statute and should not be dismissed as defective under Rule 12.

---

[4] The correct statutory reference is Fed.R.Crim.P. 12(b)(3)(B)(v) alleging a failure to state an offense.

McLinn attempts to attack Kansas law; however, his attack is not legal, but is instead factual – that he is innocent under the law.   This is obvious because the defendant premises his arguments upon a statement that "the government will be incapable of proving" that the defendant was either adjudicated a mental defective, or alternatively, committed to a mental institution.   These are strictly jury questions. (*See United States v. Baker*, No. CR14-4088-7-LTS, 2013 WL 866981 (N.D. Iowa, 2015) adopting report and rec. in *United States v. Baker*, No. CR14-4088-MWB, 2014 WL 7399272 (N.D.Iowa, 2014); *United States v. Johnson*, No. CR15-3035-MWB, 2016 WL 614727 (Feb. 16, 2016)[5], adopting report and rec. *United States v. Johnson*, No. CR15-3035-MWB, 2016 WL 212366 (Jan. 19, 2016).)

The defendant attempts to challenge the propriety of McLinn's § 922(g)(4) charge upon the fact that he was only held for a short period of time, that he was not ordered to undergo treatment, and that there was no final trial.   Neither Federal law (§ 922(g)(4)) or Kansas law (K.S.A. 59-2974) require any specific length of time of the involuntary commitment, nor does it require any sort of care and treatment, nor does it require a final/trial determination to have an individual's rights restored.   In fact, Kansas law provides for restoration of firearm rights of a person who is involuntarily committed to a state psychiatric hospital who is "released by order of the court or termination of the case." Even when a case is terminated, as in McLinn's case without a final determination, Kansas law provides that the patient follow the procedure outlined in K.S.A. 75-7c26 for the issuance of a certificate of restoration.   Why?   Because a person who is involuntarily

---

[5] This case likewise made a challenge to the propriety of a § 922(g)(4) charge asserting the same legal challenges of constitutionality and vagueness.

committed and released by the court or whose case is terminated had his rights effectively taken away as a result of the involuntary commitment. If this were not the case, Kansas would have no reason to include this provision within their statutory construction.

Contrary to the defendant's assertions, the Government can establish beyond a reasonable doubt that he was adjudicated a mental defective, or alternatively, that he was committed to a mental institution. This was not some sort of ex parte temporary detention. Despite what the defendant states, Judge Kittle did adjudicate McLinn a mental defective by finding that he suffered from a severe mental disorder, and that he was likely to cause harm to self or others. (Doc. 53, D.Ex. 6.) Further, clearly McLinn was committed to a mental hospital.

## CONCLUSION

Based upon the above arguments and authorities, the Government requests that the Court deny the Edward McLinn's motions to dismiss Count 1. Title 18 U.S.C. § 922(g)(4) is not vague and does not violate the due process clause of the Fifth Amendment. This statute has been found to be legally sound by the United States Supreme Court and courts throughout the country. Edward McLinn's further attempt at a pre-trial judicial determination of his guilt should likewise be denied. Count 1 appropriately tracks the statutory language in stating the offense. The Government has an interest in prohibiting individuals like Edward McLinn, who has been adjudicated a mental defective, or alternatively, who has been committed to a mental institution, from possessing firearms.

Further, the Government requests the Court to dismiss the joinder motion of Daryl

McLinn as lacking standing, as he is not implicated in any way in the charge outlined in Count 1.

Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney


___*s/ Terra D. Morehead*_____
Terra D. Morehead, #12759
Assistant U.S. Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101
(913) 551-6730
Terra.Morehead@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2016, I electronically filed the foregoing Response with the clerk of the court by using the CM/ECF system, which will send a notice to counsel of record.

___*s/ Terra D. Morehead*_____
Terra D. Morehead
Assistant United States Attorney